# In The United States Court of Federal Claims

No.  05-743T

(Filed:  December 4, 2009)
_____

| | |
|---|---|
| ELWOOD J. LEBLANC, JR. AND JANICE L. LEBLANC, | * Federal income tax; Summary judgment; |
| | * Abandonment of partnership interest; Section |
| | * 165 of the Internal Revenue Code – loss |
| Plaintiffs, | * deduction; TEFRA partnership provisions; |
| | * Jurisdiction – whether abandonment loss |
| v. | * deduction was proper is "affected item" over |
| | * which jurisdiction lies; Adjusted basis of |
| THE UNITED STATES, | * partnership interest; Section 705 of the Internal |
| | * Revenue Code; Treatment of distributed |
| Defendant. | * losses; Partnership interest had zero basis; |
| | * Loss deduction properly disallowed. |

_____

**OPINION**
_____

*Thomas E. Redding,* Redding & Associates, P.C., Houston, TX, for plaintiffs.

*Bart D. Jeffress*, United States Department of Justice, Washington, D.C., with whom was Acting Assistant Attorney General *John A. DiCicco*, for defendant.

**ALLEGRA, Judge:**

Plaintiffs were limited partners in an "agricultural" partnership that generated large "farming" expense deductions for its partners in its first year of operation.  After an audit and in settlement of a succeeding lawsuit, the partnership agreed to the disallowance of a portion of those deductions as, *inter alia*, lacking in economic substance.  Plaintiffs essentially agreed to the same adjustments in a separate settlement with the Internal Revenue Service (IRS).  A dozen years later, plaintiffs abandoned their partnership interest and sought to deduct a loss roughly equivalent to the amount of their share of the previously-disallowed farming expenses.  This equivalence was no more than coincidence, plaintiffs assert, claiming that their loss deduction was impelled by the relevant provisions of the Internal Revenue Code.  Not so, defendant remonstrates, asserting, *inter alia*, that plaintiffs' deduction stemmed from a gross misapplication of the Code's rules for calculating the adjusted basis of their partnership interest.  Who is right? That is the subject of defendant's pending motion for summary judgment.

## I.      BACKGROUND

Plaintiffs, Elwood and Janice LeBlanc, held a limited partnership interest in Agri-Cal Venture Associates (ACVA) from 1986 through 1998.  Plaintiffs initially contributed $26,000 to the partnership, while assuming $41,600 (or some lesser amount) in partnership liabilities.  On its partnership tax return for tax year 1986, ACVA claimed a net loss of approximately $34 million.  Approximately $32 million of those losses arose from reported farming expenses, with the remainder attributable to miscellaneous expenses and pass-through loss deductions from two other partnerships.  Based on their distributive share of these losses, plaintiffs claimed a corresponding pass-through loss deduction on their 1986 return of $69,380.

On March 14, 1990, the IRS issued ACVA a Notice of Final Partnership Administrative Adjustment (FPAA) disallowing approximately $33 million of the claimed losses for 1986 – specifically, $32,181,001 of the farming expenses claimed on Schedule F and other deductions in the amount of $634,885.  By way of explanation, the FPAA asserted that:

1.      The partnership's activities constituted a series of sham transactions lacking economic substance.

2.      The partnership did not actively engage in the trade or business of farming during the taxable period.

3.      The partnership did not pay or incur any bona fide trade or business expenses during the taxable period, or if the partnership did pay or incur any expenses during the taxable period, it has not been established that they were ordinary and necessary trade or business expenses currently deductible under section 162 of the Internal Revenue Code (IRC) and the Regulations thereunder.

As a result of these readjustments, the FPAA determined that the tax preference item of qualified investment expenses should be $1,309,608 in lieu of the $31,738,390 reported on the partnership tax return – a reduction of $30,428,782.

On June 13, 1990, ACVA filed a petition in the United States Tax Court seeking the readjustment of various partnership items under section 6226 of the Code.[1]  The petition contested the FPAA findings, claiming that the IRS had erred in: (i) disallowing the partnership's 1986 deductions; (ii) determining that the partnership's activities constituted sham transactions lacking economic substance; and (iii) determining that the partnership had not incurred or paid *bona fide* ordinary and necessary business or trade expenses.  The IRS issued no additional FPAAs to ACVA through 1998.  Plaintiffs abandoned their partnership interest in ACVA in

---

[1]  Except as otherwise indicated, all references herein are to the Internal Revenue Code of 1986 (26 U.S.C.), as amended, and in effect during the years at issue.

1999.  At the time of the abandonment, plaintiffs' share of ACVA's liabilities had been reduced to zero.

On May 5, 2000, while ACVA's petition for readjustment was still pending before the Tax Court, plaintiffs sent the IRS an executed Form 870-P(AD), offering to settle the 1986 partnership items.  On June 16, 2000, an authorized official of the IRS signed the form 870-P(AD), signifying the agency's acceptance of the settlement offer.  Under the terms of the settlement, the parties agreed to the disallowance of approximately $17 million of the partnership losses originally reported, decreasing ACVA's 1986 net loss by over 50 percent.  The settlement agreement did not address other aspects of the FPAA's findings, such as whether ACVA's activities constituted sham transactions or if the reported partnership liabilities were *bona fide*.  Pursuant to the settlement, on March 5, 2001, the IRS sent plaintiffs a notice of adjustment reflecting a reduction of $35,239 in their 1986 pass-through loss and a subsequent increase of $14,598 in tax liability.  On March 26, 2001, the IRS sent plaintiffs a notice requesting payment of the $14,598 tax deficiency, plus $47,368.12 in interest; plaintiffs thereafter paid these amounts.

While plaintiffs were in the midst of settling with the IRS, the aforementioned Tax Court proceeding continued.  On July 19, 2001, the Tax Court granted a motion for entry of decision pursuant to Rule 248(b) of the Tax Court Rules of Practice and Procedure and issued a decision adopting a settlement agreement between ACVA and the Commissioner of Internal Revenue.  That decision made the following adjustments for the partnership's 1986 taxable year:

**ADJUSTMENT TO
ORDINARY INCOME**:

| Partnership Item | As Reported | As Determined |
| --- | --- | --- |
| Farming Expense Schedule F | $32,181.001.00 | $16,081,646.00 |
| Other Deductions | $    634,885.00 | $    634,885.00 |
| Capital Contributed | $12,660,000.00 | $12,660,000.00 |
| Liabilities | $27,607,878.00 | $ 4,391,130.00 |

**TAX PREFERENCE
ITEMS:**

| Partnership Item | As Reported | As Determined |
| --- | --- | --- |
| Qualified Investment Expense | $30,428,782.00 | $ 5,781,469.00 |

By way of explanation, the decision indicated "[t]hat the foregoing adjustments to partnership income and expense are attributable to transactions which lacked economic substance, as described in former I.R.C. § 6621(c)(3)(A)(v)," and "[t]hat liabilities in the amount of $23,216,748 lack economic substance."[2]

On May 24, 2002, plaintiffs filed a tax refund claim for 1999. They claimed a loss of $34,084, owing to the abandonment of their partnership interest, and a resulting tax refund of $8,789, due to their claimed basis in ACVA at the termination of the partnership. On July 10, 2003, the IRS disallowed plaintiffs' refund claim based on its determination that the ACVA partnership was a "sham[] and had no economic substance."

Plaintiffs filed a refund suit in this court on July 11, 2005, and an amended complaint on November 7, 2008. Their amended complaint averred that, "[a]s an indirect consequence of the settlement [with the IRS], there was a substantial basis in the [ACVA] partnership interest and a resulting loss upon the abandonment of the partnership, which loss is the basis of this claim for refund." On February 18, 2009, defendant filed a motion for summary judgment, contending that this court lacks subject matter jurisdiction over this suit, or, in the alternative, that plaintiffs had no basis upon which to claim an abandonment loss. Plaintiffs filed their response on March 16, 2009, and defendant filed its reply on May 15, 2009. Oral argument was held on July 8, 2009.

## II.    DISCUSSION

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. RCFC 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Clearmeadow Invs., LLC v. United States*, 87 Fed. Cl. 509, 518 (2009). Disputes over facts that are not outcome-determinative will not preclude the entry of summary judgment. *Anderson*, 477 U.S. at 248. However, summary judgment will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." *Id*.; *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Clearmeadow*, 87 Fed. Cl. at 518.

---

[2]  The Tax Court decision allowed ACVA to deduct approximately 50 percent of its claimed farming expenses and one hundred percent of its other deductions, correspondingly reducing the deductions allowed to the partners. While the FPAA did not specifically address the issue of liabilities, the Tax Court disallowed eighty-four percent of the partnership's claimed short-term mortgages, notes, and bonds. The Tax Court's readjustment presumably required ACVA's partners to recalculate their assumed share of the partnership's liabilities and reduce their 1986 basis, accordingly, pursuant to sections 752(b) and 705(a)(2) of the Code. The Tax Court severely reduced ACVA's tax preference item of qualified investment expenses to reflect the aforementioned readjustments.

When reaching a summary judgment determination, the court's function is not to weigh the evidence, but to "determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; *see also Agosto v. INS*, 436 U.S. 748, 756 (1978) ("[A] [trial] court generally cannot grant summary judgment based on its assessment of the credibility of the evidence presented."); *Am. Ins. Co. v. United States*, 62 Fed. Cl. 151, 154 (2004). The court must determine whether the evidence reflects a disagreement sufficient to require fact finding or is so one-sided that one party must prevail as a matter of law. *Anderson*, 477 U.S. at 250-52; *Lockheed Martin Corp. v. United States*, 70 Fed. Cl. 745, 748-49 (2006). All facts must be construed, and all inferences drawn from the evidence must be viewed, in the light most favorable to the party opposing the motion. *Matsushita*, 475 U.S. at 587-88 (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)); *see also Lockheed Martin*, 70 Fed. Cl. at 749; *L.P. Consulting Group, Inc. v. United States*, 66 Fed. Cl. 238, 240 (2005).

## A.

Plaintiffs claim an ordinary loss deduction, pursuant to section 165(a) of the Code, based upon the abandonment of their interest in the ACVA partnership. At the outset, the court faces a challenge to its jurisdiction, the resolution of which necessarily requires it to delve into not only the basic provisions concerning the deductibility of losses, but also the partnership audit provisions of the Code.

### 1.

We begin with the general rules governing the deductibility of abandonment losses. Section 165(a) of the Code allows, as a deduction from gross income, "any loss sustained during the taxable year and not compensated for by insurance or otherwise." 26 U.S.C. § 165(a). A deductible loss under this provision may arise from the abandonment of property, "defined as a permanent disposition, not sold, never to be used again and not retrieved for sale, exchange, or other disposition." *Kraft, Inc. v. United States*, 30 Fed. Cl. 739, 785 (1994); *see also* Treas. Reg. § 1.165-2; *Corra Res. Ltd. v. Comm'r of Internal Revenue*, 945 F.2d 224, 226 (7th Cir. 1991); *Gulf Oil Corp. v. Comm'r of Internal Revenue*, 914 F.2d 396, 402 (3d Cir. 1990).[3] Under section 165(b) of the Code, an abandonment loss may be deducted in an amount corresponding to the taxpayer's adjusted basis in the subject property, as determined under section 1011 of the Code. *See Hartford Elec. Light Co. v. United States*, 204 Ct. Cl. 875, 881 (1974); *Parmelee Transp. Co. v. United States*, 351 F.2d 619, 623 (Ct. Cl. 1965).

Once an abandonment is established, the availability of a deduction therefor is qualified by section 165(c), which provides –

---

[3] Some express manifestation of abandonment is required when the asset is an intangible property interest, such as a partnership interest. *See Milton v. Comm'r of Internal Revenue*, 2009 WL 3460727, at *3 (U.S. T.C. Oct. 28, 2009); *Citron v. Comm'r of Internal Revenue*, 97 T.C. 200, 209-10 (1991).

> **(c)  Limitation on losses of individuals.** –  In the case of an individual, the
> deduction under subsection (a) shall be limited to –
>
>> (1)  losses incurred in a trade or business;
>>
>> (2)  losses incurred in any transaction entered into for profit,
>>     though not connected with a trade or business; . . .

26 U.S.C. § 165(c); *see also* Treas. Reg. § 1.165-1(e).  Section 183(a) of the Code reinforces the
"for profit" requirement in section 165(c)(2) by requiring, with exceptions not herein relevant,
that "[i]n the case of an activity engaged in by an individual . . . , if such activity is not engaged
in for profit, no deduction attributable to such activity shall be allowed under this chapter . . . ."
26 U.S.C. § 183(a); 7 Mertens Law of Federal Income Tax (hereinafter "Mertens") § 28:64
(2009).[4]  For purposes of these provisions, "profit" means economic profit independent of tax
savings.  *See Kirchman v. Comm'r of Internal Revenue*, 862 F.2d 1486, 1491 (11th Cir. 1989)
("Naturally, the profit or economic motivation cannot be merely tax benefits."); *see also Holmes
v. Comm'r of Internal Revenue*, 184 F.3d 536, 543 (6th Cir. 1999).  In addition, the Treasury
Regulations under section 165 provide that "[o]nly a bona fide loss is allowable," adding, in
terms familiar to tax lawyers, that "[s]ubstance and not mere form shall govern in determining a
deductible loss."  Treas. Reg. § 1.165-1(b); *see also Cottage Sav. Ass'n v. Comm'r of Internal
Revenue*, 499 U.S. 554, 567 (1991); *Henley v. United States*, 396 F.2d 956, 962-63 (Ct. Cl.
1968).  The taxpayer generally bears the burden of demonstrating that the requisite profit motive
exists.  *See INDOPCO, Inc. v. Comm'r of Internal Revenue*, 503 U.S. 79, 84 (1992); *see also
New Colonial Ice Co. v. Helvering*, 292 U.S. 435, 440 (1934).

---

[4]  As noted by one commentator, "[w]hen determining whether a taxpayer has engaged in
an activity for profit and whether a taxpayer may avoid the Section 183 limitation on the amount
of deductible losses, a facts and circumstances test is applicable."  Mertens, *supra*, at § 28:1
(citing Treas. Reg. § 1.183-2(b)).  The Treasury Regulations provide a nonexclusive list of the
factors that may be considered in resolving this profit motive issue, including:

> (1)  the manner in which the taxpayer carries on the activity;
> (2)  the expertise of the taxpayer or advisors;
> (3)  the time and effort expended by the taxpayer in carrying on the activities;
> (4)  an expectation that assets used in the activity may appreciate in value;
> (5)  the success of the taxpayer in carrying on other similar or dissimilar activities;
> (6)  the taxpayer's history of income or losses with respect to the activity;
> (7)  the amount of occasional profits, if any; and
> (8)  the financial status of the taxpayer.

Treas. Reg. § 1.183-2(b); *see also Johnson v. United States*, 32 Fed. Cl. 709, 715 (1995), *aff'd
sub nom.*, *Drobny v. United States*, 86 F.3d 1174 (Fed. Cir. 1996).

**2.**

So does this court have jurisdiction to consider the deductibility, under section 165, of a loss attributable to the abandonment of a partnership interest?  As a further prelude to answering this question, this court is yet again obliged to explore "the wilds of the TEFRA partnership provisions."  *Keener v. United States*, 76 Fed. Cl. 455, 457 (2007), *aff'd*, 551 F.3d 1358 (Fed. Cir. 2009), *cert. denied*, 120 S. Ct. 152 (2009).

"Although they file information returns under section 701 of the Code," this court has observed, "partnerships, as such, are not subject to federal income taxes.  Instead, under section 702 of the Code, they are conduit entities, such that items of partnership income, deductions, credits, and losses are allocated among the partners for inclusion in their respective returns." *Grapevine Imports Ltd. v. United States*, 71 Fed. Cl. 324, 326 (2006); *see also United States v. Basye*, 410 U.S. 441, 448 (1973); *Keener v. United States*, 551 F.3d 1358, 1361 (Fed. Cir.), *cert. denied*, 130 S. Ct. 152 (2009) (*Keener II*).  Prior to 1983, the examination of a partnership for federal tax purposes was a tedious affair, essentially encompassing an audit of each partner.  If the matter proceeded to litigation, multiple proceedings in different venues involving the same partnership were common, sometimes producing a welter of inconsistent results.[5]  Seeking to remedy this situation, Congress passed the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. No. 97-248, 96 Stat. 324, 648-71 (TEFRA).  TEFRA "created a single unified procedure for determining the tax treatment of all partnership items at the partnership level, rather than separately at the partner level."  *In re Crowell*, 305 F.3d 474, 478 (6th Cir. 2002) (citing H.R. Conf. Rep. No. 97-760, at 599-600 (1982)); *see also Keener II*, 551 F.3d at 1361.  Under this new regime, partnerships are required to file informational returns reflecting the distributive shares of income, gains, deductions, and credits attributable to their partners, while individual partners are responsible for reporting their *pro rata* share of tax on their income tax returns.  *See* 26 U.S.C. § 701; *Weiner v. United States*, 389 F.3d 152, 154 (5th Cir. 2004), *cert. denied*, 544 U.S. 1050 (2005).

"The threshold determination whether, *vel non*, an item is a 'partnership item' governs how the TEFRA procedures apply."  *Keener*, 76 Fed. Cl. at 458.  Under this taxonomy, the treatment of partnership items is resolved at the partnership level, in a unified partnership proceeding.[6]  While the phrase "partnership item" is variously defined by TEFRA, the concept generally encompasses items "required to be taken into account for the partnership's taxable year" and those "more appropriately determined at the partnership level than at the partner level." 26 U.S.C. § 6231(a)(3).  Such items, more specifically, include the income, gains, losses,

---

[5]  *See Bassing v. United States*, 563 F.3d 1280, 1282-83 (Fed. Cir. 2009); *Grapevine Imports*, 71 Fed. Cl. at 326-27; *see also* 2 Arthur B. Willis, John S. Pennell & Philip F. Postlewaite, Partnership Taxation (hereinafter "Willis") ¶ 20.01[2] (6th ed. 2009) (describing the pre-1983 procedures).

[6]  *See* 26 U.S.C. § 6221; *see also id.* at §§ 6211(c), 6230(a)(1); *Bassing*, 563 F.3d at 1283; *AD Global Fund, LLC ex rel. North Hills Holding, Inc. v. United States*, 481 F.3d 1351, 1355 (Fed. Cir. 2007).

deductions and credits of a partnership, as well as the accounting practices and the legal and factual determinations that underlie the determination of the amount, timing, and characterization of these income tax ingredients, among which are "whether partnership activities have been engaged in with the intent to make a profit for purposes of section 183." Treas. Reg. §§ 301.6231(a)(3)-1(a), 301.6231(a)(3)-1(b).  Nonpartnership items are those that are not partnership items, 26 U.S.C. § 6231(a)(4), the tax treatment of which is resolved at the individual partner level, using, *inter alia*, the normal deficiency procedures of the Code. *Id.* at §§ 6211, 6212, 6230(a)(2); *see also Keener II*, 551 F.3d at 1361-62.  Finally, at the "interstices between partnership and nonpartnership items lie . . . so-called 'affected items,' hybrids of a sort," *Keener*, 76 Fed. Cl. at 458, defined as "any item to the extent such item is affected by a partnership item."  26 U.S.C. § 6231(a)(5); *see also Gingerich v. United States*, 77 Fed. Cl. 231, 241 (2007).  Under TEFRA, affected items have two prongs – one is a partnership issue, the other a nonpartnership issue, with the former affecting the latter. *See Keener*, 76 Fed. Cl. at 460; Willis, *supra*, at ¶ 20.02[4][c].

If the IRS decides to adjust a "partnership item" reflected on the partnership's return, it must notify the individual partners of the adjustment through a FPAA.  26 U.S.C. § 6223; *Kaplan v. United States*, 133 F.3d 469, 471 (7th Cir. 1998).  Various partners with significant roles or interests in the partnership have the right to file a petition for readjustment of the partnership items in the Tax Court, this court, or the United States district courts.  *See* 26 U.S.C. §§ 6226(a), 6226(b)(1); *see also Monahan v. Comm'r of Internal Revenue*, 321 F.3d 1063, 1065 (11th Cir. 2003).  If a partner's tax liability might be affected by the outcome of the litigation of partnership items, that partner may participate fully in the proceedings.  26 U.S.C. §§ 6224(a), 6224(c).  The IRS may assess additional tax liability against individual partners within one year of the final conclusion of the partnership's tax determination.  *Id.* at § 6229(d).  In theory, the partner may contest the tax liability by paying the assessment and filing a refund action in this court.  However, with exceptions not relevant herein, "[n]o action may be brought [in this court] for a refund attributable to partnership items (as defined in section 6231(a)(3))."  *Id.* at § 7422(h); *see also Bassing*, 563 F.3d at 1282; *Prochorenko v. United States*, 243 F.3d 1359, 1362-63 (Fed. Cir. 2001).

To the extent a partner settles his partnership tax liability with the IRS, the partner no longer participates in the partnership level litigation, and instead is bound by the terms of the settlement agreement.  26 U.S.C. §§ 6224(c)(1), 6226(d), 6228(a)(4)(B).  Partnership items convert to nonpartnership items when the IRS enters into a settlement agreement with the partner with respect to such items.  *Id.* at § 6231(b)(1)(C).  If a partner files an action for a refund attributable to partnership items, but those items have been converted through a settlement agreement, the jurisdictional bar of section 7422(h) no longer applies.  *See Alexander v. United States*, 44 F.3d 328, 331 (5th Cir. 1995); *Prati v. United States*, 81 Fed. Cl. 422, 429 (2008); *see also Keener*, 76 Fed. Cl. at 459.

**B.**

Within this TEFRA framework, defendant argues that this court lacks subject matter jurisdiction to resolve plaintiffs' entitlement to their claimed abandonment deduction because that resolution requires determination of a partnership item – whether the partnership acted with a profit motive or instead conducted transactions that were shams – which TEFRA prohibits plaintiffs from litigating in this partner-level suit. Plaintiffs, for their part, readily acknowledge that whether a partnership transaction has economic substance is a partnership item that must be resolved in a partnership proceeding. They contend, however, that this issue already has been resolved here, either in their earlier settlement with the IRS or the Tax Court's subsequent decision in the partnership-level proceeding. These events, they asseverate, pave the way for this court to resolve their entitlement to the claimed loss deduction.

**1.**

As both parties agree, for plaintiffs to obtain a section 165 loss deduction, they must show that the partnership engaged in activities with an intent to generate a profit. There are several reasons for this, among them, that no part of a partner's outside basis may be attributable to a disregarded partnership (or disregarded transaction thereof). *See Petaluma FX Partners, LLC v. Comm'r of Internal Revenue*, 2008 WL 4682543, at *10-11 (U.S. T.C. Oct. 23, 2008); *Napoliello v. Comm'r of Internal Revenue*, 97 T.C.M. (CCH) 1536, 1539 (2009); *Farmer v. Comm'r of Internal Revenue*, 68 T.C.M. (CCH) 178, 181 (1994). But, as plaintiffs note, establishing that their partnership was not a sham (or at least not entirely so) is only one of several showings that they must make to obtain their claimed loss deduction. As explained by the Sixth Circuit in *Illes v. Comm'r of Internal Revenue*, 982 F.2d 163, 165 (6th Cir. 1992) (citations omitted), *cert. denied*, 507 U.S. 984 (1993) –

> To be valid, an asserted deduction must satisfy both components of a two-part test. The threshold question is whether the transaction has economic substance. If the answer is yes, the question becomes whether the taxpayer was motivated by profit to participate in the transaction. If, however, the court determines that the transaction is a sham, the entire transaction is disallowed for federal tax purposes, and the second inquiry is never made.

*See also Forseth v. Comm'r of Internal Revenue*, 845 F.2d 746, 748 (7th Cir. 1988); *Enrici v. Comm'r of Internal Revenue*, 813 F.2d 293, 295 (9th Cir. 1987). These cases teach that a court ascertaining whether a deduction is allowable under section 165(c)(2) must approach that matter from a dual perspective – training one eye on the partnership, to be sure, but the other on the individual partner involved.[7] Indeed, the latter focus often predominates, for most of the

---

[7]   *See Marinovich v. Comm'r of Internal Revenue*, 77 T.C.M. (CCH) 2075, 2076 (1999) ("Under section 165(c)(2), in order for individual taxpayers to be entitled to loss deductions with respect to funds invested in partnerships, the underlying partnership transactions must have

questions involving the deductibility of an abandonment loss under section 165 sound at the partner-level, including those involving the individual partner's motivation, the extent of his or her investment, and the adjusted basis of the partnership interest at the time of its abandonment.

Given this twin focus, it is natural to conclude that whether plaintiffs are entitled to a loss deduction here is not, as defendant claims, a partnership item, but rather, as plaintiffs assert, an affected item within the meaning of TEFRA – that is to say, an item (the deductibility of losses under section 165) "affected by a partnership item" (whether the partnership here was a sham). *See* Treas. Reg. § 301.6231(a)(5)-1(a).  It is the sort of affected item that "require[s] findings of fact peculiar to the particular partner."  *Bob Hamric Chevrolet, Inc v. United States*, 849 F. Supp. 500, 511 (W.D. Tex. 1994); *see also N.C.F. Energy Partners v. Comm'r of Internal Revenue*, 89 T.C. 741, 744 (1987).  In such instances, "[it] is well-established that the partnership prong of an affected item . . . must be determined first in a unified partnership proceeding," with "[t]he result from that proceeding . . . then [being] applied at the individual partner level to the extent that it impacts what otherwise is a nonpartnership item."  *Keener*, 76 Fed. Cl. at 460.[8]  *Keener* and like cases thus teach that "partners must first raise any partnership item that 'affects' their personal items at the partnership-level proceeding – they must, in other words, obtain resolution of the partnership prong of their affected items before later turning to the affected nonpartnership prong."  *Id.* at 461.  Logic and experience, not to mention the relevant Code provisions, suggest that the same result should obtain if the partnership prong of an affected item is itself converted into a nonpartnership item as the result of a settlement.  *See Weiner v. United States*, 389 F.3d

---

economic substance, and, at the partner level, the individual taxpayers must have had a profit objective for investing in the partnerships."); *Wright v. Comm'r of Internal Revenue*, 67 T.C.M. (CCH) 3125, 3126 (1994) ("[W]e have consistently held that even if a taxpayer invests with the subjective intent of making a profit, the investment will not be recognized for tax purposes if the overall transaction lacks economic substance and business purpose.").

[8]  *Katz v. Comm'r of Internal Revenue*, 335 F.3d 1121, 1124 (10th Cir. 2003); *Clark v. United States*, 68 F. Supp. 2d 1333, 1347 (N.D. Ga. 1999); *Bedrosian v. Comm'r of Internal Revenue*, 94 T.C.M. (CCH) 614, 616 (2007) ("Because the tax treatment of affected items depends on partnership-level determinations, affected items cannot be tried as part of a partner's personal tax case until the resolution of the partnership proceeding."); *GAF Corp. & Subs. v. Comm'r of Internal Revenue*, 114 T.C. 519, 528 (2000) ("[B]ecause the tax treatment of an 'affected item' depends upon the partnership-level determination, affected items generally cannot be tried as part of a partner's tax case prior to the completion of the partnership-level proceeding." (quoting *Gillilan v. Comm'r of Internal Revenue*, 66 T.C.M. (CCH) 398, 401 (1993))); *Dubin v. Comm'r of Internal Revenue*, 99 T.C. 325, 328 (1992); *Maxwell v. Comm'r of Internal Revenue*, 87 T.C. 783, 792-93 (1986).  Courts also have jurisdiction over affected items when the IRS accepts the partnership return as filed because that fulfills the requirement that there be an "outcome of a partnership proceeding."  *Roberts v. Comm'r of Internal Revenue*, 94 T.C. 853, 860 (1990); *see* 26 U.S.C. § 6230(c)(4); *Ginsburg v. Comm'r of Internal Revenue*, 127 T.C. 75, 83 (2006).

152, 155 (5th Cir. 2004), *cert. denied*, 544 U.S. 1050 (2005); *Mellina v. United States*, 518 F. Supp. 2d 825, 828-29 (N.D. Tex. 2007); *see also Schell v. United States*, 84 Fed. Cl. 159, 167-68 (2008); *Prati*, 81 Fed. Cl. at 436; *Keener*, 76 Fed. Cl. at 463-64.  Hence, whether the sham issue here was resolved in a prior partnership level proceeding or converted into a nonpartnership item by virtue of a qualifying settlement, the result seemingly is the same – section 7422(h) would no longer bar this court from exercising jurisdiction as a resulting refund would no longer be "attributable to" a partnership item within the meaning of that section.

        Plaintiffs assert that the "sham" transaction issue was resolved in their favor by the settlement agreement.  They contend that their settlement, which was embodied in an IRS Form 870-P(AD), was "comprehensive;" that, *a fortiori*, the sham issue was necessarily resolved in their favor by that settlement; thereby converting what would otherwise be a partnership item into a nonpartnership item.  This is a shorthand version of an argument that this court thoroughly considered and rejected in *Keener*.  There, plaintiffs likewise argued that an issue – involving the statute of limitations – had been converted into a nonpartnership item because their settlement agreement was "comprehensive" and had failed to resolve that issue adversely to plaintiffs. Rebuffing this assertion, this court first noted that neither the Code nor the Treasury Regulations require that a TEFRA settlement resolve all of the issues presented by a given partner's return. In this regard, the court specifically rejected the notion that such a rule sprang from Treas. Reg. § 301.6224(c)-3T(b) (1987), which states that "[s]ettlements shall be comprehensive, that is, a settlement may not be limited to selected items."  *See Keener*, 76 Fed. Cl. at 465.  In holding that this regulation did not support the plaintiffs, the court elaborated –

> A careful review reveals that this regulation had nothing to do with the scope of all TEFRA settlements, but rather was designed only to implement the requirement under section 6224(c) of the Code that if the IRS enters into a settlement agreement with any partner, it shall offer any other partner who so requests settlement terms consistent with those contained in the first settlement agreement.  Placed in its proper context, it is readily apparent that not every TEFRA settlement had to be "comprehensive" under this regulation, but rather only those subsidiary agreements entered into based upon the consistency requirement – in other words, the regulation sensibly indicates that to obtain a consistent settlement, the second partner seeking to settle must agree to all the terms that were in the original settlement.

*Id*.  The Keeners' position, the court went on to note, conflicted with section 6231(b)(1)(C) of the Code,[9] which plainly envisions that the partnership/nonpartnership conversion occurs only as to

---

[9] That subparagraph provides –

**(b)  Items cease to be partnership items in certain cases. –**

**(1) In general**.–  For purposes of this subchapter, the partnership items of a

specific individual items.  It observed that "[u]pon close reading, the language of section 6231(b)(1)(C) plainly applies on an item-by-item basis, as it states that the partnership items of a partner shall become nonpartnership items as of the date the Secretary enters into a settlement agreement with the partner with respect to 'such items.'"  *Id.* at 464.  "The last phrase, of course, would be superfluous," the court added, "if, as plaintiffs intimate, the entry of a settlement agreement as to **any** partnership item converts **every** partnership item into a nonpartnership item."  *Id.* (emphasis in original).

This reasoning comfortably fits the case at hand.  Indeed, this same reasoning was applied in *Schell*, which involved an analogous situation – the taxpayer entered into a settlement that did not address the sham transaction issue, but claimed that the settlement was "comprehensive and conclusive" and thus had the effect of converting the sham issue into a nonpartnership item.  Relying on *Keener*, the court made short shrift of this claim, opining –

> Although Section 6231(b)(1)(C) converts partnership items into non-partnership items upon a settlement agreement, this provision applies only where partnership items **specifically** were settled by agreement. . . . As previously discussed, the April 28, 1997 Settlement Agreements did not address the sham-transaction issue. . . . Accordingly, those "partnership items" *ipso facto* were not converted upon settlement to "non-partnership" items.

*Schell*, 84 Fed. Cl. at 167-68 (emphasis in original); *see also Prati*, 81 Fed. Cl. at 436-37 (concluding that a limitations issue "not being part of any settlement agreement [was] not converted into a nonpartnership item"); Willis, *supra*, at ¶ 20.02[5].  As in *Schell*, this court finds that the settlement agreement in question did not convert the determination of whether ACVA had conducted sham transactions into a nonpartnership item.

## 2.

That said, there is still the matter of the Tax Court's decision.  As noted, on July 19, 2001, the Tax Court issued a decision that disallowed approximately $16 million of the farming expense deductions claimed by ACVA, reducing the partnership's originally-reported net loss by

---

> partner for a partnership taxable year shall become nonpartnership items as of the date –
>
> *        *        *        *        *
>
> (C) the Secretary or the Attorney General (or his delegate) enters into a settlement agreement with the partner with respect to such items . . . .

approximately 47 percent.  The Tax Court held that the adjustments to the partnership's income and expenses were "attributable to transactions which lacked economic substance."  Unlike the aforementioned settlement, this decision supplies the necessary predicate for this court to exercise jurisdiction over plaintiffs' section 165 loss claim.  To be sure, the ambiguity of the decision raises some questions as to its impact on the availability of the claimed loss deduction here.  But, those questions go to the merits and are for another day.  They do not preclude this court from exercising jurisdiction over the nonpartnership prong of the affected item presented by plaintiffs' loss deduction.

In sum, this case presents questions involving the nonpartnership prong of an affected item, over which this court has jurisdiction because the partnership prong of that item has already been decided.  *See Nault v. United States*, 2007 WL 465310, at *4 (D.N.H. Feb. 9, 2007), *aff'd*, 517 F.3d 2 (1st Cir. 2008) (applying prior Tax Court sham ruling in partnership proceeding in holding taxpayer-partner not entitled to loss deduction under section 165(c)(2)).[10]  This is not a case involving losses distributed by the partnership, as is true of most of the cases cited by defendant in arguing that this court lacks jurisdiction.  Because the latter cases focus solely on the activities of the partnership, they present issues resolvable at the partnership level that are preeminently  "partnership items" within the parlance of TEFRA.[11]  For the reasons discussed

_____

[10]  *See also Desmet v. Comm'r of Internal Revenue*, 581 F.3d 297, 304 (6th Cir. 2009) ("TEFRA's purpose is not to completely eliminate partner-level determinations;" instead, the statute "contemplates the necessity of partner-level proceedings in some situations"); *Russian Recovery Fund Ltd. v. United States*, 81 Fed. Cl. 793, 800-01 (2008); *Clark*, 68 F. Supp. 2d at 1348 ("[j]urisdiction is proper in [district] court" where partnership-prong of affected item already resolved by Tax Court).

[11]  By and large, these cases involve whether a partner's distributive share of partnership losses is deductible under section 162(a) of the Code.  *See Hill v. Comm'r of Internal Revenue*, 204 F.3d 1214 (9th Cir. 2000); *Hildebrand v. Comm'r of Internal Revenue*, 28 F.3d 1024 (10th Cir. 1994), *cert. denied*, 513 U.S. 1079 (1995); *Wolf v. Comm'r of Internal Revenue*, 4 F.3d 709 (9th Cir. 1993); *Pasternak v. Comm'r of Internal Revenue*, 990 F.2d 893 (6th Cir. 1993); *Cannon v. Comm'r of Internal Revenue*, 949 F.2d 345 (10th Cir. 1991), *cert. denied*, 505 U.S. 1220 (1992); *Evans v. Comm'r of Internal Revenue*, 908 F.2d 369 (8th Cir. 1990); *Simon v. Comm'r of Internal Revenue*, 830 F.2d 499 (3d Cir. 1987); *Tallal v. Comm'r of Internal Revenue*, 778 F.2d 275 (5th Cir. 1985).  Other cases cited by defendant hold that the sham transaction determination must be made at the partnership level, but involve situations in which no determination as to that issue was made prior to the filing of a partner-level suit.  *See, e.g., Schell*, 84 Fed. Cl. at 168 (holding that the court lacked jurisdiction to adjudicate a partner's abandonment loss deduction claim because no applicable sham determination had been made at the partnership level).  There can, of course, be instances in which the determination of the adjusted basis of a partnership interest is a partnership item – for example, where the basis depends, under section 732, on partnership property.  *See* 26 U.S.C. § 732(b)-(c).  Nonetheless, "[g]enerally, the basis for a partner's partnership interest and the factors entering into the determination of that basis are not partnership items."  Willis, *supra*, at ¶ 20.02[4][a][iv].

above, this case is different.  Though the issues left for this court to consider may well be shared by other partners in ACVA, they, nonetheless, focus on the statutory requirements of section 165 that indisputably apply at the individual level.  Consideration of these issues thus does not risk the sorts of inconsistency and duplication of litigation which TEFRA was enacted to prevent.

Having concluded it has jurisdiction to address plaintiffs' claim, the court now turns to the merits portion of defendant's summary judgment motion.

## C.

Many of defendant's arguments on the merits raise material questions of fact and thus are unsuitable for resolution as a matter of law.[12]  However, one of defendant's contentions – that plaintiffs had a zero basis in their partnership interest, leaving them nothing to deduct – presents a legal question that seems resolvable via summary judgment.  And it is resolvable, as it turns out, in defendant's favor.

Recall that, under section 165, a partner may claim a loss deduction for the abandonment of his partnership interest equal to his adjusted basis therein.  26 U.S.C. § 165(b); *see also Parmelee Transp.*, 351 F.2d at 623 n.2.[13]  Under section 722 of the Code, the basis of an interest in a partnership acquired by a contribution of money is the amount of the money.  *See Marriott*, 2009 WL 3447443, at *9.  To that figure is added the amount of any partnership liabilities assumed by the partner.  26 U.S.C. § 752(a); *see also* Treas. Reg. § 1.705-1(a)(2).[14]

---

[12]  Take, for example, defendant's contentions regarding how the Tax Court's decision should be construed and the nature of the income distributed by ACVA after 1986 and how it impacts the basis calculation.

[13]  This is sometimes referred to as the partner's "outside basis."  "A partnership's basis in its assets is referred to as its 'inside basis,'" the Federal Circuit recently explained, "and a partner's basis in his or her partnership interest is called his or her 'outside basis.'"  *Marriott Int'l Resorts, L.P. v. United States*, 2009 WL 3447443, at *9 (Fed. Cir. Oct. 28, 2009) (per curiam) (quoting *Kligfeld Holdings v. Comm'r of Internal Revenue*, 128 T.C. 192, 195-96 (2007)).

[14]  The practical impact of these adjustments has been well-described as follows:

By treating the partners as contributing cash in an amount equal to their shares of the debt, inside/outside basis equality is preserved and distortions are avoided.  If a liability for borrowed money were not added to the partners' bases, they could be taxed on a distribution of the borrowed cash even though there is no gain inherent in the partnership's assets.  A similar result could occur if a partnership incurs a purchase money liability to acquire property, since the liability is added to the partnership's basis in the property.

-14-

Section 705 of the Code governs the adjustment of this basis to account for, *inter alia*, the partner's distributive share of partnership income and losses.  Subsection (a) of that section provides, in relevant part –

> **(a) General rule.**– The adjusted basis of a partner's interest in a partnership shall, except as provided in subsection (b), be the basis of such interest determined under section 722 (relating to contributions to a partnership) or section 742 (relating to transfers of partnership interests) –
>
> (1) increased by the sum of his distributive share for the taxable year and prior taxable years of –
>
>> (A) taxable income of the partnership as determined under section 703(a),
>>
>> (B) income of the partnership exempt from tax under this title, and
>>
>> (C) the excess of the deductions for depletion over the basis of the property subject to depletion;
>
> (2) decreased (but not below zero) by distributions by the partnership as provided in section 733 and by the sum of his distributive share for the taxable year and prior taxable years of –
>
>> (A) losses of the partnership, and
>>
>> (B) expenditures of the partnership not deductible in computing its taxable income and not properly chargeable to capital account; . . . .

These adjustments ensure that a partner's adjusted basis in the partnership interest reflects his economic investment in the partnership, so that the partner realizes an amount of gain or loss on the sale or other disposition of that interest that accurately reflects the partner's economic gain or loss.[15]  Under the Treasury Regulations, "[a] partner is required to determine the adjusted basis of

William S. McKee, William F. Nelson & Robert L. Whitmire, Federal Tax'n of Partnerships and Partners ¶ 7.01[1], at 7-2 (3d ed. 1997); *see also Marriott*, 2009 WL 3447443, at *9; *Coloman v. Comm'r of Internal Revenue*, 540 F.2d 427, 429 (9th Cir. 1976); *Salina P'shp. LP v. Comm'r of Internal Revenue*, 80 T.C.M. (CCH) 686, 696-97 (2000).

[15]  *See Marriott*, 2009 WL 3447443, at *14 (the adjustment provisions were "intended to avoid distortions in the tax reporting of partnership items by promoting parity between a partnership's aggregate inside basis in its assets and its partners' outside bases in their partnership interests") (quoting *Salina P'ship*, 80 T.C.M. (CCH) at 698)); *see also* William S. McKee, William F. Nelson & Robert L. Whitmire, Federal Tax'n of Partnerships and Partners

his interest in a partnership only when necessary for the determination of his tax liability or that of any other person."  Treas. Reg. § 1.705-1(a); McKee, *supra*, at ¶ 6.02[2].

While the parties agree that plaintiffs' adjusted basis in their partnership interest governs the amount of any deductible loss under section 165, they vociferously disagree on how to calculate that adjusted basis.  To illustrate their differences, consider the following example –

> Assume that partner A becomes a partner in the AB partnership on January 1 and has an initial basis in the partnership of $1,000 (calculated under sections 722 and 752 of the Code).  For that year, year one, the partnership has a loss of $100,000, of which A's distributive share is $3,000.  Then, in the succeeding year, year two, the partnership has income of $33,333, of which A's distributive share is $1,000. At the end of that second year, A abandons his interest in the partnership.  What is his adjusted basis in his partnership at the time of this abandonment?

Plaintiffs essentially claim that the adjusted basis at the time of the abandonment should be $1,000 – that although A's share of the distributive losses exceeded his original basis by $2,000, his adjusted basis could never be reduced below zero; it then became $1,000 when the partnership distributed the $1,000 of income in year two ($ Ø (adjusted basis in first year) + $1,000 (adjustment for second year) = $1,000).  This leads, according to plaintiffs, to an abandonment deduction of $1,000.  For its part, defendant asserts that the partner's adjusted basis in his partnership interest at the time of the abandonment is zero.  It starts with the partner's basis of $1,000, adds thereto the sum of subsequent distributions of income ($1,000), and then subtracts therefrom the sum of subsequent distributions of loss ($3,000).  Defendant notes that while these calculations leave the taxpayer with a negative adjusted basis (-$1,000), section 705(a)(2) sets that basis to zero, with the latter number then corresponding to the amount of the abandonment deduction.  ($1,000 (original basis) + $1,000 (sum of distributed income) - $3,000 (sum of distributed losses) = -$1,000 or Ø).

Not surprisingly, the actual calculations in this case are a bit more complex.  Lest this complexity serve to obscure the parties' respective positions, it is worth making several precatory observations before proceeding to the numbers.  First, there are many more taxable years here than in the example above, reflecting a more varied distribution of income and losses.  Yet, the rub here remains the same – how to calculate the adjusted basis of the partnership interest where there is an initial contribution to the partnership, followed by a large distributed loss that exceeds the partner's original basis, and then some distributed income.  Second, unlike the example above, plaintiffs calculate an adjusted basis for each year in this lengthy sequence, while defendant determines the adjusted basis only at the time of the claimed deduction.  As will be

---

¶ 6.02[2] (4th ed. 2009) (hereinafter "McKee") ("The purpose of the § 705(a) adjustments is to keep track of a partner's 'tax investment' in the partnership with a view toward preventing double taxation or exclusion from taxation of income items upon ultimate disposition of the partnership interest.").

discussed in greater detail, this seemingly minor detail masks a much larger dispute between the parties.  Finally, while the parties agree that plaintiffs invested $26,000 in cash in the partnership, they differ as to how much liability plaintiffs initially assumed – defendant claims this amount was $41,600, while plaintiffs assert that, at most, it was $8,141.[16]  This causes the parties to begin with different original bases for the partnership interest ($34,141 and $67,600 for plaintiffs and defendant, respectively).  This difference, however, ultimately falls out of the calculation, as both parties agree that from 1994 through 1999, plaintiffs were relieved of whatever debt they originally assumed.

With this preface, the accompanying chart generally encapsulates the parties' respective positions:

|  | Plaintiffs' Distributive Share of Income and Loss | Sum of Distributive Income Minus Distributive Loss | Plaintiffs' Adjusted Basis | Defendant's Adjusted Basis |
|---|---|---|---|---|
| Original Basis | ----- | ----- | $34,141 | $67,600 |
| 1986 | ($69,380) | ($69,380) | 0 | X |
| 1987 | $3,784 | ($65,596) | $ 3,784 | X |
| 1988 | $6,661 | ($58,935) | $10,445 | X |
| 1989 | $7,217 | ($51,718) | $17,662 | X |
| 1990 | $5,708 | ($46,010) | $23,370 | X |
| 1991 | $7,683 | ($38,327) | $31,053 | X |
| 1992 | $2,764 | ($35,563) | $33,817 | X |
| 1993 | $3,972 | ($31,591) | $37,789 | X |
| 1994 | $2,088 | ($29,503) | $39,877 | X |
| 1995 | $5,771 | ($23,732) | $45,648 | X |
| 1996 | $6,249 | ($17,483) | $51,897 | X |

---

[16]  Plaintiffs derive the amount of liabilities they assumed from the amount of the 1986 loss they were permitted to deduct under the Form 870-P(AD) settlement.  Because a partner may not deduct distributed losses in excess of the adjusted basis in his partnership interest, *see* 26 U.S.C. § 704(d), plaintiffs abductively reason that, in 1986, they must have had sufficient basis to allow for the $34,141 deduction they were granted under the settlement.  They calculate that since their cash contribution was $26,000, the amount of partnership debt that they assumed must have been $34,141 less that amount, or $8,141.

| 1997 | ($ 1,004) | ($18,487) | $50,893 | X |
|---|---|---|---|---|
| 1998 | ($  535) | ($19,022) | $50,358 | X |
| 1999 | ($ 8,380) | ($27,402) | $41,978 | $40,198 |
| **Subtotal** | **($27,402)** | **($27,402)** | **$41,978** | **$40,198** |
| **Reduction in Liabilities (1994-1999)** | | | ($8,141) | ($41,600) |
| **Final Adjusted Basis** | | | **$33,837** | **0 (per § 705(a)(2))** |

As can be seen, plaintiffs maintain that their final adjusted basis in their partnership interest was $33,837, while defendant counters that the basis was a negative number which, via section 705(a) of the Code, is set at zero.[17]  The effect of defendant's position, of course, is to deny plaintiffs any claimed loss deduction.

    In the court's view, defendant's position pays more respect to the statutory language. Section 705(a) requires that the adjusted basis be determined by increasing the original basis by "the sum of [the partner's] distributive share for the taxable year and prior taxable years" of partnership income, and decreasing it "by the sum of his distributive share for the taxable year and prior taxable years" of losses.  As a textual matter, these words clearly anticipate that the calculation will be cumulative and reflect a partner's entire period of ownership – why else

---

    [17]  The negative number is produced by subtracting from $40,198 (the number produced by reducing plaintiffs' original basis to reflect the partnership's distributed income) $41,600 (the figure corresponding to the amount of partnership liabilities from which plaintiffs were released). Defendant's calculation would yield the same result (*i.e.*, a negative number that would be set to zero) if the reductions in liabilities were accounted for in the actual years those liabilities were reduced.  K-1 forms in the record suggest that those reductions occurred in the following fashion:

| | **Plaintiffs' share of liabilities as reported on K-1 forms** | **Change in plaintiffs' share of liabilities** |
|---|---|---|
| 1991 | $41,600 | |
| 1992 | $41,608 | $8 |
| 1993 | $41,607 | ($1) |
| 1994 | $13,234 | ($28,373) |
| 1995 | $7,108 | ($ 6,126) |
| 1996 | $0 | ($ 7,108) |

would the statute require that income and losses from not just the current taxable year or any set of years, but all *prior* years be summed in making the calculation. As such, it would appear that if a partnership incurs and distributes a significant loss in one taxable year, that loss is carried along in ultimately calculating what the adjusted basis of a partnership interest would be in a later year. This is important because, of course, the statute dictates that the adjusted basis at any particular point cannot go "below zero." The latter phrase, however, does not alter the way that the rest of the statute operates – it does not mean that the sum of the distributive shares of income and losses over the history of the partnership is permanently set to zero at any point that the sum becomes negative. For if that were true, the calculation of the adjusted basis in subsequent years would not reflect the sum of the distributive shares "for the taxable year and *prior* taxable years" – such prior losses would be largely, and, in some cases, entirely, factored out of the equation, a result that cannot be squared with the statutory formula.

Nor, as plaintiffs intimate, does the statute envision that the calculation of the adjusted basis in the partnership interest for one year begins with the basis value set for the immediately prior year, with any negative result for that prior period being set to zero. Instead, more fluidly and comprehensively, it anticipates that the calculation of adjusted basis will occur only when needed and that the calculation, to that point in time, will reflect all preceding distributed income and losses. Perhaps hinting at this result, the relevant Treasury Regulation states that the adjusted basis need be determined "only when necessary for the determination of [the partner's] tax liability or that of any other person." Treas. Reg. § 1.705-1(a)(1). Though a subtle point, that the adjusted basis need not be calculated annually provides a further clue that plaintiffs are simply wrong in suggesting that the calculation of adjusted basis for one year begins with the comparable figure for the immediate past year.

Defendant's reading of the statute, moreover, finds support in its legislative history. Prior to the 1954 Code, there were no provisions in the federal income tax laws that specifically dealt with the treatment of the sale of a partnership interest. Before 1950, the Internal Revenue Bureau, indeed, had treated the sale of a partnership interest as a sale of the selling partner's undivided interest in each specific partnership asset. *See* G.C.M. 10092, 11-1 C.B. 114 (1932). But, this view was repeatedly rejected by the courts,[18] leading the Bureau to adopt the prevailing view that "the sale of a partnership interest should be treated as the sale of a capital asset under the provisions of section 117 of the [1939] Code." G.C.M. 26379, 1950-1 C.B. 58. Applying the rules found in section 113 of the 1939 Code, the Treasury Regulations in effect at this time required that the basis in a partnership interest be adjusted to reflect the "net income earned since

---

[18]  *Swiren v. Comm'r of Internal Revenue*, 183 F.2d 656, 660 (7th Cir. 1950), *cert. denied*, 340 U.S. 912 (1951); *McClellan v. Comm'r of Internal Revenue*, 117 F.2d 988, 988 (2d Cir. 1941); *Comm'r of Internal Revenue v. Smith*, 173 F.2d 470, 470 (5th Cir.), *cert. denied*, 338 U.S. 818 (1999); *Thornley v. Comm'r of Internal Revenue*, 147 F.2d 416, 422 (3d Cir. 1945); *Comm'r of Internal Revenue v. Shapiro*, 125 F.2d 532, 535 (6th Cir. 1942); *Stilgenbaur v. United States*, 115 F.2d 283, 287 (9th Cir. 1940); *Shapiro v. United States*, 83 F. Supp. 375, 376-77 (D. Minn.), *aff'd*, 178 F.2d 459 (8th Cir. 1949).

[the partner] became a partner." Treas. Reg. 118, § 39.113(a)(13)-2(a) (1953).  Both the courts and commentators viewed the regulation as requiring a partner's adjusted basis in his partnership interest to be reduced by the partnership's historical losses.[19]  In enacting section 705, as part of the 1954 Code, Congress made clear its intent to adopt the existing practice for calculating the adjusted basis of a partnership interest.  *See* H. R. Rep. No. 1337, at A224-25 (1954) ("While there are no provisions in the 1939 Code analogous to the provisions in this section, the adjustments required are in accord with existing practice."); S. Rep. No. 1622, at 384 (1954) (same).[20]  Although these reports do not specifically address the issue at hand, they do indicate that the "adjustments to the basis of a partner's interest are necessary to prevent unintended benefit . . . to the partners."  H. R. Rep. No. 1337, at A225; S. Rep. No. 1622, at 384.  By way of example, they note that "the partner's share of nondeductible expenditures must be deducted from his basis in order to prevent such amounts from eventually constituting capital loss to him."

---

[19]  *See Senner v. Comm'r of Internal Revenue*, 22 B.T.A. 655, 657 (1931); *Appeal of Meyer*, 3 B.T.A. 1329, 1333 (1926); Paul Little, Federal Income Taxation of Partnerships § 7.15 (1952).  As observed by another set of commentators –

> Despite the obvious importance of this concept, the 1939 Code did not contain any definition of the basis of a partner's interest in the partnership.  Under the Regulations, however, it appeared that a partner's original basis for his interest would equal either: (a) any money plus the basis in his hands of any property contributed to the partnership; (b) the price paid in purchasing the interest from another partner; or (c) in the case of an inherited interest, its value at the date of the deceased partner's death.  This original basis would then be increased by the partner's distributive share of any partnership gain taxed to him and would be decreased by his distributive share of any partnership loss and by the amount of any money or the basis in his hands of any property distributed to him by the partnership.

J. Paul Jackson, Mark H. Johnson, Stanley S. Surrey, Carolyn K. Tenen & William C. Warren, "The Internal Revenue Code of 1954: Partnerships," 54 Colum. L. Rev. 1183, 1192 (1954) (citing Treas. Reg. 118, § 39.113(a)(13)-1, 2); *see also Sherlock v. Comm'r of Internal Revenue*, 34 T.C. 522, 526 (1960), *aff'd*, 294 F.2d 863 (5th Cir. 1961), *cert. denied*, 369 U.S. 802 (1962); Peter Miller, "Capital Gains Taxation of the Fruits of Personal Effort: Before and Under the 1954 Code," 64 Yale L.J. 1, 34 n.205 (1954).

[20]  Echoing these sentiments, the Joint Committee on Internal Revenue Taxation, in its explanation of the 1954 Code, stated that "[a]lthough the statutory provisions of the 1939 Code did not provide for the adjustments described above with respect to the basis of a partner's interest in a partnership, these adjustments were implicit in the provisions and regulations then in effect."  Jt. Comm. on Internal Revenue Tax'n, "Summary of the New Provisions of the Internal Revenue Code of 1954" 89 (Feb. 1955).

H. R. Rep. No. 1337, at A225; S. Rep. No. 1622, at 384.[21]  At all events, there is not a shred of evidence in these reports to suggest that Congress intended a partner's adjusted basis to be calculated in the balkanized fashion that plaintiffs have offered.[22]

There is little doubt in the court's mind that what plaintiffs seek here is essentially that which the Congress, in 1954, forbade – *to wit*, the conversion of disallowed partnership deductions into an allowable loss deduction upon an individual partner's later disposition of his partnership interest.  Plaintiffs, of course, say no.  But, one would have to don blinders bigger than old Dobbins' to ignore that plaintiffs' deduction here stems from their failure to reflect fully, in their basis calculation, the losses previously incurred by ACVA.  The statute and the Treasury Regulations require the basis calculation to reflect cumulatively all income and non-capital expenditures from prior years; yet, plaintiffs' approach essentially begins the calculation only in the year following that in which ACVA incurred substantial nondeductible expenditures.  But, there is no reset button here; nor even an accounting principle lurking (as is true elsewhere in the Code).  And that poses a big problem for plaintiffs whose method of calculating basis, unlike the statutorily-prescribed method, appears highly sensitive to the sequencing of income and nondeductible expenditures.  Under their method, if, for example, the pattern here were reversed and the income was received in the earlier years and the nondeductible expenditures occurred in a later year, there would be no basis associated with plaintiffs' abandoned partnership interest.[23]

_____

[21]  *See also* Mertens, *supra*, at § 35:23 ("The amount of expenditures that are nondeductible and not properly chargeable to a capital account must decrease the outside basis in order to prevent a conversion of a nondeductible expenditure into a recognized loss."); Partnership – Allocation of Liabilities; Basis Rules 714 3rd T.Mgmt. IV-A(7) (BNA) (2009) ("This basis decrease is necessary to ensure that a partner cannot convert a nondeductible expenditure into a recognized loss upon the sale or disposition of the interest.").

[22]  Although not cited by either party, research reveals one case – *Falkoff v. Comm'r of Internal Revenue*, 62 T.C. 200, 208 (1974) – that appears to calculate adjusted basis in a fashion similar to that argued by plaintiffs.  That case, however, deals with an undistributed negative capital account and the Tax Court has subsequently limited *Falkoff* to its facts.  *See Tapper v. Comm'r of Internal Revenue*, 52 T.C.M. (CCH) 1230, 1240 (1986).  To the extent *Falkoff* can be read more broadly as authorizing plaintiffs' approach to basis calculation, this court, for the host of reasons indicated above, refuses to follow it.

[23]  The chart below shows the dramatic impact of using plaintiffs' method for calculating basis, but shifting the major loss year from the beginning to the end of the sequence:

| | Plaintiffs' Distributive Share of Income and Loss | Sum of Distributive Income Minus Distributive Loss | Plaintiffs' Adjusted Basis | Defendant's Adjusted Basis |
|---|---|---|---|---|
| Original Basis | ----- | ----- | $34,141 | $67,600 |
| 1986 | $ 3,784 | $ 3,784 | $37,925 | X |

Such wildly varying results cannot be what Congress intended in requiring the adjusted basis to reflect the impact of the partner's share of income and expenses from not only the taxable year, but all prior years.  Moreover, it does not follow that because the statute prevents the partnership basis from ever going below zero, Congress intended to introduce arbitrariness into the calculation of basis – with the end result fluctuating greatly based upon the pattern of income and losses, rather than the net sum thereof.  While "[l]ogic and taxation are not always the best of friends," *Sonneborn Bros. v. Cureton*, 262 U.S. 506, 522 (1923) (McReynolds, J., concurring), this court will not attribute to Congress such illogical results, without the flimsiest of textual support and in the face of legislative history suggesting an opposite intent.

Finally, "[s]ince context gives meaning," *United States v. Santos*, 128 S. Ct. 2020, 2024 (2008), it is noteworthy that plaintiffs' method of calculating basis cannot be reconciled with section 704(d) of the Code, which limits the deductibility of distributed partnership losses.  That subsection allows for the deduction of a partner's distributive share of a partnership loss "only to the extent of the adjusted basis of such partner's interest in the partnership at the end of the partnership year in which such loss occurred."  26 U.S.C. § 704(d); *see also Comm'r of Internal*

| 1987 | $ 6,661 | $10,445 | $44,586 | X |
|---|---|---|---|---|
| 1988 | $ 7,217 | $17,662 | $51,803 | X |
| 1989 | $ 5,708 | $23,370 | $57,511 | X |
| 1990 | $ 7,683 | $31,053 | $65,194 | X |
| 1991 | $ 2,764 | $33,817 | $67,958 | X |
| 1992 | $ 3,972 | $37,789 | $71,930 | X |
| 1993 | $ 2,088 | $39,877 | $74,018 | X |
| 1994 | $ 5,771 | $45,648 | $79,789 | X |
| 1995 | $ 6,249 | $51,897 | $86,038 | X |
| 1996 | ($ 1,004) | $50,893 | $85,034 | X |
| 1997 | ($   535) | $50,358 | $84,499 | X |
| 1998 | ($ 8,380) | $41,978 | $76,119 | X |
| 1999 | ($69,380) | ($27,402) | $ 6,739 | $40,198 |
| **Subtotal** | **($27,402)** | **($27,402)** | **$ 6,739** | **$40,198** |
| **Reduction in Liabilities (1994-1999)** | | | ($8,141) | ($41,600) |
| **Final Adjusted Basis** | | | **0 (per § 705)** | **0 (per § 705)** |

Accordingly, using the same net sum of income and losses, plaintiffs' method produces wildly different results depending upon when large expenditures arise.

*Revenue v. Tufts*, 461 U.S. 300, 315 (1983).  Under that provision, the nondeductible portion of a loss may be carried forward and deducted in a subsequent year in which additional basis is generated.[24]  In this regard, Treas. Reg. 1.704-1(d)(1) provides –

> (d) Limitation on allowance of losses. (1) A partner's distributive share of partnership loss will be allowed only to the extent of the adjusted basis (before reduction by current year's losses) of such partner's interest in the partnership at the end of the partnership taxable year in which such loss occurred.  A partner's share of loss in excess of his adjusted basis at the end of the partnership taxable year will not be allowed for that year.  However, any loss so disallowed shall be allowed as a deduction at the end of the first succeeding partnership taxable year, and subsequent partnership taxable years, to the extent that the partner's adjusted basis for his partnership interest at the end of any such year exceeds zero (before reduction by such loss for such year).

*See also Sennett v. Comm'r of Internal Revenue*, 80 T.C. 825, 829 (1983), *aff'd*, 752 F.2d 428 (9th Cir. 1985); *Chong v. Comm'r of Internal Revenue*, 93 T.C.M. (CCH) 687, 689 (2007) ("if [a partner's distributive share of partnership losses is greater than his available adjusted basis, the excess loss can't be claimed in that year but must instead be carried forward until he once again has adjusted basis available to offset the loss").  As an accompanying example in the regulation illustrates,[25] the carryforward of the disallowed portion of the partner's share of deductible losses

---

[24]  *See* S. Rep. No. 1622, at 383 ("any loss in excess of the basis of a partner's partnership interest may be allowed as a deduction only at the end of the partnership year in which the loss is repaid, either directly, or out of future profits").

[25]  Example 1 in this regulation states:

At the end of the partnership taxable year 1955, partnership AB has a loss of $20,000.  Partner A's distributive share of this loss is $10,000. At the end of such year, A's adjusted basis for his interest in the partnership (not taking into account his distributive share of the loss) is $6,000.  Under section 704(d), A's distributive share of partnership loss is allowed to him (in his taxable year within or with which the partnership taxable year ends) only to the extent of his adjusted basis of $6,000.  The $6,000 loss allowed for 1955 decreases the adjusted basis of A's interest to zero.  Assume that, at the end of partnership taxable year 1956, A's share of partnership income has increased the adjusted basis of A's interest in the partnership to $3,000 (not taking into account the $4,000 loss disallowed in 1955). Of the $4,000 loss disallowed for the partnership taxable year 1955, $3,000 is allowed A for the partnership taxable year 1956, thus again decreasing the adjusted basis of his interest to zero.  If, at the end of partnership taxable year 1957, A has an adjusted basis for his interest of at least $1,000 (not taking into account the disallowed loss of $1,000), he will be allowed the $1,000 loss previously disallowed.

presumes that any subsequent income distributed by the partnership will be absorbed by the carryforward, leaving the adjusted basis of the partnership interest at zero until such time as subsequent income exceeds the carried-forward loss.  Since the carried-forward loss effectively shields subsequent distributed income of the partnership from taxation, allowing the partner to treat that income as also contributing to a positive basis could lead to a double deduction – one taken at the time that the carried-forward losses were deducted and another when the partnership interest is later abandoned.  Again, this makes no sense and cements the view that plaintiffs' construction of the relevant provisions is erroneous.[26]

In sum, the court finds, as a matter of law, that plaintiffs' basis in their partnership interest at the time of the alleged abandonment was zero.  Plaintiffs, therefore, are not entitled to the deduction claimed.[27]

---

This example serves to illustrate that as the undeducted portion of the distributed loss is carried forward, subsequent distributions of partnership income do not contribute to a positive basis until such time as the carried-forward loss is fully absorbed.  That result, as the foregoing suggests, springs not only from section 704(d), but also from a proper construction of section 705(a) of the Code.

[26]  Plaintiffs could not take advantage of this carryforward to the extent that their distributed losses were nondeductible.  That, of course, may be precisely the reason why they have pursued instead their novel abandonment theory.  But, the fact remains that their construction of the basis adjustment rules of section 705 would apply whether *vel non* losses were deductible, and would, if adopted, give rise to the double deduction scenario described above.

[27]  Plaintiffs argue that the ACVA losses disallowed under the settlement agreement should be excluded from their basis calculation, effectively increasing their basis by the amount of disallowed pass-through loss.  This argument is based on plaintiffs' claim that the Tax Court's finding as to lack of economic substance results in the entire nonrecognition of the losses at issue, requiring the court to treat those losses as if they never existed.  Plaintiffs' argument, however, is directly contradicted by section 705, which explicitly provides that basis must be reduced by "expenditures of the partnership not deductible in computing its taxable income . . . ."  26 U.S.C. § 705(a)(2)(B); *see also* Treas. Reg. §1.705-1(a)(3)(ii).  While this rule might not apply if the partnership made no expenditures whatsoever, that plainly is not the basis upon which either the Tax Court's decision and the plaintiffs' settlement with the IRS proceeded.  The decisional law, moreover, plainly suggests that plaintiffs would be in no better position to deduct their supposed losses if the partnership itself was viewed as a factual sham.  *See Forseth*, 85 T.C. at 164.

**III.**     **CONCLUSION**

The court need go no further.  Based on the foregoing, it **GRANTS** defendant's motion for summary judgment.   The Clerk is hereby ordered to dismiss the complaint**.**

**IT IS SO ORDERED**.

s/ Francis M. Allegra
Francis M. Allegra
Judge